Our next case is Barnes v. Wexford Health Sources. Mr. Donner. Your Honors, may it please the Court, I apologize, I'm due for a root canal, so my voice may come in and out a little bit in the next ten minutes. Don't do anything other than the best you can. I appreciate that, Your Honor. Thank you. My name is Ted Donner. I represent Leon Barnes, who is the plaintiff appellant in this case. Mr. Barnes, actually until yesterday, thanks to the ruling of a judge in 26th and California, was serving a life sentence in the Illinois Correctional System. He has been released as of yesterday. But during most of the time that he was in prison, from the time he was 18, he had a problem with prolapsing hemorrhoids. That problem was there when he got to Joliet in roughly 2012. It was still going on when he filed suit in December of 2017. And it was only finally reconciled in 2019 when he got the surgery that had been found necessary at the beginning of 2017. He filed this case in December of 2017 because at that point he was still suffering from these prolapsing hemorrhoids. He was unable to get through a given day without having bleeding. Some of the testimony from his deposition, for example, shows that when he first met Dr. Abbasi, the senior physician at the prison, he actually showed Dr. Abbasi how you could remove these hemorrhoids physically out of your backside. These are not hemorrhoids you treat with preparation aids. This is a bleeding serious problem. As the district court finally did recognize in the closing remarks of his ruling on the summary judgment. We brought this appeal, Your Honors, because this is one of so many Wexford cases that show up in this courthouse. Our first and foremost concern is that we were faced in the motion for summary judgment with the fundamental question of how do you get a judgment against Wexford when you don't have evidence of what happened in all these other cases to show that Wexford had notice of the problems that were going on. Before we get to the Monell claim, I want to really drill down on the constitutional violation. As to the doctors? Yes, sir, if that's fine. I'm not bringing up the second doctor that we brought up.  I'm sorry? Dr. Aguinaldo? Aguinaldo. Yeah. Are we or I guess the contention is because he was brought up first in the reply brief. Are we not arguing that one today? We spoke about two doctors, Dr. Abbasi and Dr. Aguinaldo. And I may be mispronouncing their names. That's how I've always heard them anyway. But I don't think we waived either one, Your Honor. We spoke to Dr. Aguinaldo. I just didn't see an argument regarding Dr. Aguinaldo in the opening brief. What we spoke about with Dr. Aguinaldo, Your Honor, is primarily in the facts. And what we said about him in the argument section of it was the way things work chronologically. Dr. Aguinaldo replaced Dr. Abbasi as the senior physician there in December of 2017 when Dr. Abbasi passed away. He was then the physician that had the case when… Counsel, I don't think you understood my colleague's question. And it's one that bugs me as well. Where in your opening brief do we find an argument about the liability of Dr. Aguinaldo? I will check that, Your Honor. I'm sorry. I did not understand the question, Your Honor. We mostly talked about him in the statement of facts, as I said. I believe the argument about him was just in the general about the doctors and what we noticed we had about them. And I quoted the cases relating to Dr. Aguinaldo. And let me find that. Sir? What we said beginning at page 24 of the brief was that the court had misconstrued the evidence with respect to Dr. Abbasi and Dr. Aguinaldo. And I spoke in general terms about both of them at that point because really it was only a general argument. But personal liability is personal, right? You can't speak in general terms and seek personal liability. That ought to be a clear proposition. I agree with that, Your Honor. All I was speaking to in the brief was the errors that had been made, which was the failure to consider evidence on those scores. And that was really the only error that we were concerned with. There had been evidence… Let's move to Dr. Abbasi. I'm sorry? Let's move to Dr. Abbasi. That's mostly Dr. Abbasi, yes, Your Honor. And frankly, I have always said that when it comes to Dr. Aguinaldo, if it will make things simpler, the only concern we had with Dr. Aguinaldo was that three-month period between when suit was filed and when my client was finally moved to another facility where they did help take care of him. And we cited some cases on the reply brief on that score to show that Dr. Aguinaldo's… As we said in the opening brief about him factually, his just disregard, he just ignoring what was going on with this patient, was what had given rise to liability in the Jivas case, which was decided in 2022. And it's the only reason that we would hold Dr. Aguinaldo in this case at all. My client testified in his deposition. We said in the statement of facts that he had been… He had complained to both Dr. Abbasi and Dr. Aguinaldo repeatedly, and neither one of them did anything about it. But that's the only factual thing we spoke about was the basic idea that my client's testimony had been disregarded in the context of this case. We didn't say this element as to each person. If the trial court had considered my client's testimony with respect to their disregard, the findings with regard to them in the summary judgment would have been different. And that was all we argued about it. I did not—Counsel's correct. I did not sit back and go through each of the elements for a cause of action against them and say, check, check, check. What I said was they did intentionally disregard this patient, and there was evidence to show that in both cases. What do we have of deliberate indifference? I'm sorry? What do we have? What evidence do we have that demonstrates deliberate indifference? We have a patient who tells—he saw Dr. Aguinaldo for an initial check when he came in. I believe that was 2012. It might have been 2013. He then sees Dr. Abbasi repeatedly. His testimony was that he saw them off and on, that they had him do this demonstration to show him how bad it was, and he kept asking them to do something about it. And he did not finally get to see an outside specialist until June of 2017, despite repeatedly requesting it over the course of years. When he finally did see that specialist in June of 2017, that specialist said, you need a surgery. And that specialist said that surgery requires a physical therapy. It's kind of a muscle process, that physical therapy. It's just a very simple process, and asked him to get it done. That was in June of 2017. In September of 2017, it still wasn't done, but he complained. Dr. Abbasi said to him, look, I can do whatever I want to do. And the record is not clear to me, and I don't know that I will ever be able to tell what day he said that to Mr. Barnes as compared to the day that he finally submitted a request for a collegial review on this. They did happen, counsel says, within two days of each other. But that's the second trip to the doctor. That's not the time, which I believe was after the second trip to the doctor, and that's what my client testified, that my client said he went in, and the doctor said, I'll do whatever I want to do when I want to do it. I believe the record fairly concludes that that happened after whenever that collegial review was requested, or was approved to get the therapy. And then instead of doing what that document said, which was to go ahead and get the therapy, my client sat in his cell again for three months until December when he filed his lawsuit, filing his grievances, complaining about things along the way. But in the course of that three-month period, after Dr. Abbasi said to him, we'll do what we want to do when we want to do it, they did nothing, and my client continued to suffer. He then goes and sees Dr. Aguinaldo a few months after that, I believe in April, now that Dr. Aguinaldo is the supervising physician. Dr. Aguinaldo testifies, no big deal there. My client says he complained about what was going on, and still nothing happens. This is after a lawsuit has been filed and after the judge who first had this case in 2017 sent instructions to the jail to tell the penitentiary, make sure this guy gets the treatment he needs, that everybody confirmed was circulated, that they knew about. So still another four months. He goes back to the doctor. The doctor says, why haven't you gotten this done? The longer you wait, the more aggravated your pain is going to be. And he still gets nothing until he finally ends up in Hill Penitentiary across the state where finally another collegial review is asked for, two days after the second lipid report comes out. And when that report comes out, the doctors suddenly say, let's do a collegial review. They bless it, and off he goes to get the therapy he needs, and months later he's fine. But this is six years after the problem first started, two years after he filed suit in this courthouse, and it's after two doctors, the two doctors that he first sued, had left him be for months and months. Your time has expired. Thank you, Your Honor. I'm sorry. Thank you, Your Honor. Mr. Craig. May it please the Court, Patrick Craig on behalf of Dr. Aguinaldo, the estate of Dr. Obeisi, and Wexford Health Sources. This court's order granting these defendants summary judgment should be affirmed. To answer Your Honor's question, we firmly believe that argument with respect to Dr. Aguinaldo was forfeited by not being addressed in the opening brief. At the very least, the arguments raised in the reply brief were raised for the first time there and did not give Dr. Aguinaldo a chance to respond to those arguments, but we'll do so here briefly. It appears from counsel's argument that maybe adjusting the time frame of which he's seeking to hold Dr. Aguinaldo as deliberately indifferent to the three months before Barnes was transferred to Hill. Just to clarify the record, Dr. Okezi was actually the medical director at Stateville after Dr. Obeisi passed away, and while Dr. Aguinaldo saw Barnes in October of 2017 and March of 2018, those were for issues separate and apart from hemorrhoids, and Dr. Okezi was the medical director during those three months before Barnes was transferred. And regarding the first instance of which Dr. Aguinaldo was aware of the hemorrhoids issue was in July 2016, and at that visit Dr. Aguinaldo performed a fecal occult blood exam as well as a rectal exam, and those tests revealed no evidence of hemorrhoids, and he instructed Barnes to follow up as needed, and that first time that Barnes followed up was a couple months later with Dr. Obeisi, and at that date of treatment Dr. Obeisi prescribed fiber supplements, which was the exact same treatment that his colorectal surgeon, Dr. Nordenstam, eventually prescribed for him. And then at the second visit with Dr. Obeisi where the hemorrhoids issues continued, Dr. Obeisi referred Barnes to see a colorectal surgeon that was approved by a collegial review. He then saw Dr. Nordenstam for colorectal specialty care. At the first visit Dr. Nordenstam recommended an MRI, which Dr. Obeisi timely referred, and it was approved by collegial review. The MRI showed that Barnes' hemorrhoids were likely caused by extreme straining during bowel movements, which resulted in Dr. Nordenstam recommending a specialized form of physical therapy, and that specialized form of physical therapy that Dr. Obeisi immediately recommended the next day. There's some testimony from Barnes' deposition that Barnes states creates an issue of fact as to when the timing of the referral has actually occurred. And just to be clear, the testimony he is stating and which he repeated here today was that Dr. Obeisi told him, this is just a recommendation, that doesn't mean I have to do that. But that's not a contradiction to the fact that it shows that Dr. Obeisi did actually end up referring Barnes for the physical therapy the day after Dr. Nordenstam recommended it, and saying that even if we take the testimony as true that he told Barnes I don't have to recommend this, he did end up doing that. Let me interrupt you and go to causation. Now there's this point in the district court's order where it says that Barnes hasn't presented sufficient verifying medical evidence that the delay in his treatment caused harm. The district court also goes on to say that Barnes hasn't shown that Dr. Obeisi caused the delay. But the district court is making a separate statement that Barnes hasn't shown sufficient evidence that the delay caused Barnes harm. Can you respond to Barnes's point in reply about our case, Grievanson? You know, Grievanson held that causation on deliberate indifference claim is made out in absence of medical evidence, where you've got an inmate's medical records showing that they suffered from the ailment, and evidence that the inmate was susceptible to further symptoms without a specific intervention, and that care from a specialist is necessary. And as I look at this record, Barnes can check off all three, because he's got Dr. Nordenstam and these medical records from Dr. Nordenstam saying that he could have more symptoms without intervention, the specific intervention of therapy and then surgery, and that care from a specialist was therefore necessary. So can you address Grievanson and how that should impact that, how we look at that statement from the district court's opinion? Sure. So I think Barnes's primary issue with Grievanson is that there's no showing that Dr. Obeisi was the cause of the delay in this case, because Dr. Obeisi- No, I'm asking about a separate two causation questions here. Did the delay cause Barnes harm? Did Dr. Obeisi cause the delay? I'm not asking about the second one. The district court clearly addresses both, at least superficially. And on this question about whether Barnes has shown the delay caused Barnes harm, address that. Well, the delay in Grievanson, I believe, was for a nose injury, and it was the bleeding of the nose needed additional care for that. From Dr. Obeisi's perspective, I know we're talking about that, he recommended it, but for terms of the verifying medical evidence standard of did the delay cause harm, there is no verifying medical evidence of any sort from Barnes that that standard was satisfied. The physical therapy was needed for a surgery that would be ordered by Dr. Nordenstam, but the physical therapy delay, there's no showing that Dr. Obeisi was the one personally responsible for that delay. I'm asking about the point in Dr. Nordenstam's notes that say this guy has these hemorrhoids, and he's going to continue to have symptoms and continue to be harmed without these particular interventions. So Dr. Nordenstam recommended the physical therapy and believed that UIC would be able to offer that physical therapy. It was the understanding of everyone involved in the care. Why isn't that sufficient for Barnes to show that the delay in his care, not getting the physical therapy, caused him harm, separate and apart from Obeisi? Because he has to directly causally link that delay to any of the defendants, which he cannot do in this case. Even if the delay causes harm, even if he had verifying medical evidence that it caused harm, he has to causally link that to any action of the defendants. Okay. Now, do you dispute that he has the evidence to show that the delay caused him harm, even if you contest that Dr. Obeisi was the cause of the delay? He does not have the evidence that would cause him harm. Dr. Nordenstam's note was that this physical therapy was needed to prevent the recurrence of hemorrhoids. He wasn't going to sign off on a hemorrhoidectomy unless Barnes could show improvement in that when he was having bowel movements, he wouldn't suffer from the severe straining that caused the hemorrhoids in the first place. And so the goal of the physical therapy was to correct the possibility of a recurrence, so that that delay didn't result in the increase or delay of pain. It was Dr. Nordenstam's treatment plan to require physical therapy to happen first, and in the meantime, Dr. Nordenstam's only recommendation for treatment of the pain, for treatment of the hemorrhoids, was fiber supplements, which was what Dr. Obeisi incorporated in the treatment plan from his very first visit with Mr. Barnes. So fiber supplements are what Dr. Nordenstam testified as being key to treating hemorrhoids. He said pain medication doesn't really assist. A topical cream may assist with discomfort from the hemorrhoids, but fiber supplements and regulating of bowel movements is the key to treating a patient's hemorrhoids. So that was the medical evidence that first there needed to be physical therapy before surgery. Dr. Nordenstam's treatment plan was to recommend physical therapy before surgery so that the hemorrhoidectomy wouldn't go to waste and that his bowel movements would just, the straining he experienced during bowel movements would have a recurrence of hemorrhoids. The physical therapy was not meant to treat the pain from hemorrhoids, and it wasn't actually meant to treat the hemorrhoids causing him issues in that moment in and of itself. Just to address the Wexford-Monell claim with my remaining time, unless the Court has any other issues or questions with Dr. Obeisi, it's uncommon to start with causation on the issue of Monell, but I think it also bears mentioning that in addition to forfeiting arguments with respect to Dr. Aguinaldo, that there's also forfeiture of the arguments with respect to causation under Monell. This Court has held on several occasions that the causation standard is rigorous and a high bar under Monell, and obviously by failing to address it whatsoever in any of his district court pleadings or appellate briefs, he's certainly not satisfied with that standard. To address the reply brief argument that Barnes had with respect to Wexford, that there is this collateral estoppel argument that we should stop from asserting that he did not provide enough evidence of other inmates suffering from delays in off-site scheduling to show municipal liability under Monell. He's arguing for collateral estoppel, and the elements of collateral estoppel are not present here in the case he relies on. It doesn't involve Monell or Section 1983 institutional liability, so I think it's still a very valid argument that he presents no other evidence besides his own case to try to show liability under Monell. In case there are any other questions, I ask that this Court confirm the judgment in favor of the defendants. Thank you very much, Counsel. The case is taken under advisement.